*ROANE, Judge.
This is a bill brought, by R. Pleasants the heir and executor of John Pleasants deceased, claiming title on behalf of the negroes, who were the property of the said Pleasants, at the time of his death, and their descendants.
This claim is founded upon the will of the said John Pleasants, dated the 11th of August 1771; and which has this general clause, “My further desire is respecting my poor slaves all of them as I shall die possessed with, shall be free, if they chuse it, when thejT arrive to 30 years of age, and the laws of the land will admit them to be free, without their being transported out of the country, I say all my slaves now born, or hereafter to be born, whilst their mothers are in the service of me or my heirs, to be free at the age of 30 years, as above mentioned, to be adjudged of, by my trustees, their age.”
He then gives his son Robert the plaintiff eight negroes “On condition he allows them to be free at the age of 30 years, if the laws of the land will admit of it.” And, then, devises the residue of the slaves to various persons, under conditions similar to that last mentioned, in the devise to his son Robert.
The will of Jonathan Pleasants (who was a legatee under the will of, John Pleasants of one third of his negroes on the same condition) dated the Sth of May 1776 has a general clause respecting the freedom of his negroes, as also particular conditions annexed to each bequest, in substance similar to those, before stated, to be contained in the will of John.
As, however, it does not appear, as well as I recollect, that Jonathan Pleasants had any slaves, other than those derived from his father, as aforesaid, and entitled to the benefit of his will, the will of Jonathan may be thrown out of the present case. But, if it were otherwise, I do not think it would make any material alteration in *any estate, or in the decision, which I think ought now to be given.
After a demurrer by’ some of the defendants, for that the bill contained no matter of equity, but that the matter of it was proper for the cognizance of a court of law, and answers (which it is not now necessary to specify particularly,) the Chancellor, on a hearing, overruled the demurrer, and decreed in favour of the plaintiffs; directing an account, also, to be taken of their profits. It is here to be remarked, that the cause with respect to the answers, does not appear, to have been matured and regularly set for hearing; but as all parties were willing to try it, upon the general question, which most probably did not, at all, depend upon the particular answers, and more especially, one which, involving liberty did not admit of delay, and cannot be drawn into precedent, as applicable, on the point, to other cases, the decision given in that case, as upon the general question, was not premature; and the decision, under the restrictions now contemplated as to subordinate questions, can produce no injury to any of the parties.
In considering the general question, growing out of the will of Robert Pleasants as before stated, I will first consider slaves as a species of property recognized and guaranteed by the laws of this country, and to be considered, with respect to a limitation over (by the act of 1727,) on the same footing with other chattels.
I will also consider, in the first place, the claim of the appellees to their freedom, only, as that of ordinary remainder-men, claiming property in them, and endeavour to test it by the rules of the common law, relative to ordinary cases of limitations of personal chattels. And if their claim will be sustained on this foundation, and by analogy to ordinary remainders of chattels, every argument will hold, with increased force, when “the case is considered in its true point of view, as one, which involves human liberty.
The doctrines of the common law, relative to perpetuities as to estates of inheritance, hold a fortiori as to terms for years and personal chattels. If it be contrary to the policy of that law, to render unalienable, for a long space of time, real estates of inheritance, on reasons of public inconvenience and injury to trade and commerce, these reasons apply, with much more force, as to interests of short duration in lands and personal chattels; not only, because the latter are better adapted to the purposes of trade than the former, but also, because of their transitory and perishable nature.
This observation goes to fortify what is so fully established by the books, as to render citation unnecessary; namely, that the policy and reason of the law leans, at least, as strong against perpetuities in personal as in real estates.
The utmost limits allowed by law for the vesting of an executory devise (or as Fearne has it, as applicable to personal chattels, on executory bequest,) is the term of a life or lives, in being, and twenty one years after. This limitation, then, has become a fixed canon of property, and ought not to be lightly departed from. And the true distinction is, where the event must happen, if at all, within those limits, the executory devise is good; and on the happening of *335 the contingency, the estate will become absolute, in the remaiderman.
Thus a limitation to one, in esse, in fee or in tail, after a dying without issue, is not good, because the contingency, the dying without issue, is too remote. But such a limitation to one, in esse, for life is good; because the contingency must happen, if at all, so as to vest the estate, within a life in being, viz. that of the remainderman; that is to say, the limitation in remainder for life restrains the previous disposition, in the ‘same manner, as if it had been expressly limited to the re-mainderman, on the event of d37ing without issue, in his life time.
This case seems directly parallel, with the case before us, the happening of the contingency here; i. e. the passing a law to authorize emancipation, standing simply, is too remote, as it may not happen, within 1000 years: But when the testator goes on further, and means the benefit of it to persons in esse (for they are the objects of his bounty, and unless it happened within their lives, it might as well, as to them not happen, at all,) this restrains the happening of the contingency, as in the case before put; and makes the executory devise good, at least as to all, who are within the legal limits.
Nay, the doctrine is carried so far, as to terms for years and personal estates (for it is otherwise, with regard to estates of inheritance, in favor of the heir,) that Courts are inclined to lay hold of any words, in the will, to restrain the general words, “leaving issue,” to mean leaving issue at his death; and thus to support the remainder. As, in the case of Keely v. Fowler, Fearne rem. 370, where those words were so restrained, in a case, where the estate was to return back to the executors in the event of dying without leaving issue and to be distributed by them, and ¿£50. were given them for their personal trouble. Here the words were so restrained, in order to reconcile the limitation to the devisee, with the nature of the trust reposed in the executors, and to be executed by themselves, in their lives.
The construction, in this case, must be, as it would have been, at the instant of the testators death, Doe v. Fonnercau, Cowp. 477. And (the event put out of the question, at present, and leaving, for an after consideration, the circumstances of the contingency having actually happened, and its effects upon the case,) as upon the will itself, *the estate, limited on the contingency (if I may so express it,) that is to say, the right to freedom, was good, if the contingency happened within the legal limits, in favour of such, as might be in esse to enjoy it, and void, if it happened beyond those limits.
This brings us to the consideration, whether the limitation can be sustained, as on the construction of the will itself, as to such as might be in esse during such limits; although it may be void, as to such as might be born, in a remote generation?
And I have no doubt but it may.
I have no doubt but that the limitation, as upon the will itself, may be construed distributively; so as to be efficacious, as to some of the plaintiffs, although it might be void as to future claimants; that is to say, such as claim beyond the legal limits, in the event of the contingency’s happening sooner or later, as the case may be. In the case of Forth v. Chapman, 1 Wms. 663, there was a limitation of freehold and leasehold lands in the same manner, to wit, “If the first devisee die, without issue. ’’ These last words, die without issue, were construed, under the distinction before taken, to be tied up to mean issue living at the death as to the leasehold land, and consequently the limitation was held good; but, as to the freehold lands, they were not considered as being so restrained, and they received the same construction, by the Ld. Chancellor as if they had been twice repeated.
To come now to the case, before us, as it really is. The contingency has happened, within the limits. The effect is, that the limitation over has thenceforth become vested, in interest, in all the appellees, then in esse; and vested in possession, as to all, then, or as they might become, thirty years of age. As to all the slaves, then, in esse, but under thirty years of age, their right to freedom was complete, but they were postponed *as to the time of enjoyment. They were in the case of persons bound to service for a term of years; who have a general right to freedom, but there is an .exception, out of it, by contract or otherwise.
What then, after the passing of the act, is the condition of the children born of mothers, so postponed in the enjoyment of their freedom? Are they, at their birth, entitled to freedom? Or are they too, to be postponed, until the age of thirty? The condition of the mothers of such children is, that of free persons, held to service, for a term of years, such children are not the children of slaves. They never were the property of the testator or legatees, and he, or they, can no more restrain their right to freedom, than they can that of other persons born free. The power of the testator, in this respect, has yielded to the great principle of natural law, which, is also a principle of our municipal law, that the children of a free mother are themselves also free. The conditions of the will then, as applicable to such children, if indeed it was intended, or can be construed to apply to them, is void, as being contrary to law; it being an attempt to detain in slavery, persons that are born free. Considering the mothers of such children, by analogy to others persons held to service, it will be found, that a particular law was here necessary ; the power of the Legislature, alone, was competent to subject the children of mulatto mothers, held to service till the age of thirty one, to serve till the ages, respectively, of twenty one and eighteen. But this case goes further, and, is an attempt, by an individual to hold to service, till the age of thirty, persons, who, following the condition of their mothers, are born free.
The view of the subject I have now taken, (which will sustain the claim of the plaintiff, by referring to the ordinary doctrine of limitations of personal chattels) will *336 supersede the necessity of a very delicate and important enquiry: Namely, *whether the doctrine of perpetuities is applicable to cases in which human liberty is challenged?
It is clear, that the restraints, rightly imposed on the alienation of inheritances, to prevent perpetuities are founded principally, if not solely, on considerations of public policy ana convenience. That those restraints have gradually been extended to terms for years and chattel interests, and that the utmost tolerable limits in such cases, have not been settled till after much investigation, and a considerable lapse of time. It is also clear, that neither the particular species of property now in question, nor the case of a remainderman (if I may so express it) claiming his own liberty, were in the contemplation of the judges, who established the doctrine on this subject; which therefore may- not apply. But this is an extensive question, and if it were necessary tobe now decided (but it is not,) it would be proper to weigh the policy of authorizing or encouraging emancipation (a policy which has certainly received in many instances, and partly by the act of 1782, the countenance of the Legislature, at least from the jera of our independence, and must always be dear to every friend of liberty and the human race,) against those secondary considerations of public policy and convenience; which appear to have supported and established the doctrine of the law, on the subject of perpetuities, as relative to ordinary kinds ol property.
But it is said the act of 1782, authorizing emancipation, is prospective in its operation, and does not take in the present case. In answer to this, I am of opinion, that the acceptance of the negroes, in question on the condition stated in the will, created in inchoate contract to emancipate on the part of the devises; which, on the passing of the act, became essentially complete. That an emancipation ought, therefore, to have been made; that the devisees were, thereafter, trustees, *for the purpose of making such emancipation ; and that the plaintiffs are right, in coming into a Court of Equity, to enforce the fulfillment of that trust. And this is one answer to the objection on the score of jurisdiction.
It is said too, that as the will speaks of an unqualified emancipation, (without respect to bond and security, to prevent aged and infirm slaves from being chargeable to the public,) and as the act of 1782 has required that such security should be given, an act authorizing emancipation, in the sense contemplated by the will, has not yet passed; and therefore the condition imposed upon the legatees, is not obligatory.
In answer to this, I am of opinion, that the testator cannot reasonably be supposed, to have contemplated an act of emancipation, making no provision to prevent the persons liberated from being chargeable to the public. That therefore the act, as contemplated, has substantially taken place; and, that a Court of Equity may carry the contract into execution, if in no other manner, at least by throwing the burthen of the indemnity, required by the act of 1782, upon the slaves themselves, and making it a lien, upon the liberty granted them; and such an arrangement, it is evident would place- the holders, in the same, and no worse condition, than if an unqualified act in favor of emancipation had actually passed. The necessity of making such an arrangement, in this case, shews the propriety of applying to a Court of Equity; because no other Court has adequate power. Which is another answer to the want of jurisdiction.
In what manner the arrangement should be made, in this case, so as to comply with the act of 1782, requiring an indemnification against aged and infirm slaves, becoming chargeable to the public, is a subject, upon which, I.have had considerable difficulty. But I am fully persuaded, that the powers, of a Court of Equity, which regards *the substance of things more than forms, are competent thereto; and I now beg leave to refer to the project of a decree, which I shall take the liberty of stating, presently, as containing the result of my deliberations, on the subject.
Another ground, upon which, the jurisdiction of the Court of Equity is sustainable, in the present case, is, that it involves the rights of a great number of claimants. So that the joint suit prevents a great deal of litigation and expense; besides involving, in the same common fate, those who stand on one common title. Whereas if separate suits were brought, it might turn out, either upon general or special verdicts, that persons having the same rights, nay even children of the same mother, might one be adjudged to be free, and another a slave. An enormity, which the joint proceeding is wisely calculated to prevent.
With respect to the slaves claimed by Elizabeth Pleasants and by Teasdel, paramount to the will of J. Pleasants, my opinion, in the present case, does not extend to-them, so far, as, the title, thereto, is claimed paramount to that will; but such title ought' to be considered, as still open, if desired for discussion and decision.
With respect to the debts of the original testator, if any, the original slaves and their descendants are clearly liable. But whether they are liable to the debts of the devisees accepting them, or their right to freedom is lost by a bona fide sale, if any such has taken place, are questions which I also consider, as open for the decision of the Chancellor, if required. It would seem to me, however, as at present advised, that if the limitation was good, by the rules of law, the right thereby created would not-yield, either, to the claim of creditors or purchasers. But, on this point, I give no-decided opinion.
I have now gone through, or touched upon such points in the case, as appeared to me necessary *to be noticed. There is yet one part of the Chancellor’s decree, which I could have wished had not been made. I mean the reference to a commissioner to ascertain the. profits of the slaves. We have no precedents, either of the Courts of England, or this country, to guide us. In the former country, indeed, no such case could occur; because slavery *337 is not there tolerated; and, in this country, I believe, no instance can be produced of profits being adjudged to a person held in slavery, on recovering his liberty. Among a thousand cases of palpable violations of freedom, no jury has been found to award, and no court has yet sanctioned a recovery of the profits of labour, during the time of detention. Yet it must be admitted, that juries are often excellent Chancellors. But this is not a palpable violation of freedom. To say the least, i-t is a very nice question, whether these plaintiffs be entitled to freedom or not? And ought the court, in such a doubtful case, to award that, which the whole equity of the country, flowing through a thousand channels, has not yet awarded, in a single instance? It seems to be a solecism, to award ordinary profits to recompence the privation of liberty ; which, if it is to be recompenced, the power of money cannot accomplish.
But what, with me, is decisive on this point, is this, that as, in my opinion, all the children born of the female negroes, in question, since the passage of the act of 1782, are, and were thenceforth entitled to freedom bjr birth, the burthen of rearing such persons, during their infancy (which must be borne by the legatees,) will form perhaps not an unreasonable offset against the profits of those, who were capable of gaining profits by their labour.
I have thus endeavoured to make known the grounds upon which my opinion is founded. I entirely concur in the result of the Chancellor’s decree, except-in the particulars, in which, I *have airead}1-stated my opinion to be different. As it is the policy of the country to authorize and permit emancipation, I rejoice to be an humble organ of the law in decreeing liberty to the numerous appellees now before the court. And this upon grounds, as I suppose, of strict legal right, and not upon such grounds, as, if sanctioned by the decision of this court, might agitate and convulse the Commonwealth to its centre.
The general outlines and substance of the decree, which I think should be made in this case, are as follows.
That whensoever, and as soon as the ap-pellee Robert Pleasants or any other responsible person or persons, shall under the direction of the High Court of Chancery enter into bond with sufficient securities in such Court or Courts under such' penalty or penalties, as the said High Court of Chancery shall direct, with condition to indemnify and save the public harmless, with respect to all such of the slaves in question as were in esse, at the time of the passage of the act of 1782, authorising emancipation, and shall be deemed to fall within the provisions of that act, relative to old age and infirmity, with an exception however, with respect to such indemnity, as to such of the said slaves as may be under the age of thirty and may be deemed infirm, for the period or periods of time it may respectively require them to accomplish the said age of thirty years, and during which they will remain, at the proper charge of the legatees or holders under the will or wills, in question. Or whensoever, and as soon as the Legislature of this Commonwealth shall, if it ever shall remit the indemnity above supposed, necessary to be given. And when, in addition in either case, it shall appear to the satisfaction of the said High Court of Chancery, either that there are no legal and subsisting debts of the said John Pleasants the testator, or that being so, a sufficient fund has *been raised, by the common labour, of thé said slaves to discharge the said debts, which in that event, saving the right of the legatees as aforesaid, the said Robert Pleasants or any other trustee to be appointed by the said court are authorised to do; and if it shall be found that the testator Jonathan Pleasants possessed, at his death, any slave or slaves other than those derived under the will of the said John and now in question, then a like provision to be extended to them in respect of his the said Jonathan’s proper debts, - if any; it shall be the duty of the said High Court of Chancery to emancipate and set free the said slaves respectively; subject nevertheless to the rights of the legatees and those claiming under them to their labour, until they' shall severally have attained the age of thirty years, in like manner and to all intents and purposes, as if they had been respectively emancipated, conformably to the said act. But if such indemnity be given or remitted, as the case may be, within a reasonable time, to be adjudged of by the said Court, it shall in that event be lawful, for the said Robert Pleasants or any other trustee or trustees to be appointed by the said Court to possess the whole of the said slaves (subject as aforesaid) in trust, to raise a sufficient fund to answer or procure the said indemnity and satisfy the debts, if any, as is aforesaid ; and as soon as those purposes are accomplished, in the opinion of the said Court, it shall have power and is hereby directed to manumit the said slaves, subject, as is aforesaid, in the manner above directed; adopting and pursuing, in either case, such measures as are provided by the said act of 1782, as far as may be, for preserving the evidences of their title to freedom. Provided, that nothing, herein contained, shall be construed to extend to any of the slaves, in question, born since the passage of the act of 1782, and who are entitled to freedom, by birth and not by emancipation. Nor to the paramount titles set up, by Elizabeth Pleasants and Daniel Teasdel, *to a part of the said slaves. Nor to the question, whether the said slaves are liable to pay the debts of the original legatees, or those who claim under them? Nor, if sold to bona fide purchasers, whether, such sale be valid to bar the right of liberty now asserted? Nor to bar or affect the title or titles of any person or persons whatever, other than the said testator or testators, as the case may be, and those claiming under them respectively. All which questions ought to be considered, as open and undecided, as if the present decision had never been made.